# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,                  CASE NO. 20-20428
                                         HON. DENISE PAGE HOOD

v.

DAVID ALLEN KOMOR,

        Defendant.

_____/

## ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS [# 13]

**I.    BACKGROUND**

On September 16, 2020, Defendant David Allen Komor ("Komor") was indicted on two counts related to dealing in commercial grade firework explosives. (ECF No. 1). The first was for being a felon in possession of explosives (18 U.S.C. § 842(i)(1)) (Count I) and the second was for dealing in explosives materials without a license (18 U.S.C. § 842(a)(1)) (Count II). (*Id*.) On November 13, 2020, the parties stipulated a continuance because of the unprecedented and exigent circumstances created by COVID-19. (ECF No. 12). On November 13, 2020, Komor filed a Motion to Suppress. (ECF No. 13). The Government filed a Response on January 4, 2021. (ECF No. 20). An evidentiary hearing was held on February 8, 2021.

1

Komor seeks to suppress all evidence seized without a warrant from his home and garage on July 2, 2020. Komor argues that he was neither advised of his rights against the search and seizure nor presented with a consent to search form explaining his rights by the Michigan Bureau of Fire Services ("MBFS") or Bureau of Alcohol, Tobacco & Firearms ("ATF") officials.

## II. FINDINGS OF FACT

On Thursday, July 2, 2020, Michigan Bureau of Fire Services ("MBFS") Regional Supervisor Mick Dingman ("Dingman") visited Komor at his home around 6:30 p.m. and left around 7:30 p.m. Portions of the interaction between Komor and Dingman were obtained via iPhone camera.

At some point prior to Dingman visiting Komor's home, a citizen complained to MBFS that Komor was selling commercial grade explosives out of his garage. (ECF No. 20, Page.ID 58). Dingman verified this information by viewing Komor's Facebook page where he saw advertisements displaying fireworks for sale in Komor's garage. (*Id.*) Prior to approaching Komor's home, Dingman drove by and observed, from his point of view, boxes of commercial grade fireworks in Komor's open and detached garage that resembled the fireworks he had previously seen in the Facebook advertisements. (*Id.*) With this information, Dingman called back-up that included one additional MBFS marshal, Bill Yost ("Yost") and one ATF official, Brian Batten ("Batten"). (*Id.*)

At that time, Komor was swimming in his backyard with his family. (ECF No. 13, Page.ID 2). Komor's stepbrother and neighbor across the street, Mark Siegrist ("Siegrist"), saw from his window Dingman, Yost, and Batten prepare to approach Komor's home. (ECF No. 25, PageID.128). Siegrist took note of the vests the three men were wearing that read "Marshals" and called Komor a few times (Komor did not pick-up at least once) to alert of him that the Marshals were at his house. (*Id.*) In plain clothes, wearing state fire marshal vests, Dingman and Yost (whose iPhone was recording) approached Komor's home. (*Id.*) The iPhone footage depicts Komor's garage door open. The officers are greeted by Komor's fiancé, who goes and retrieves Komor from the backyard. (ECF No. 20, Page.ID 59). Shortly thereafter, but prior to greeting the officials, Komor closes his garage. (ECF No. 20, Page.ID 59).

As Komor approaches Dingman, he throws something in the trash, towels off, and greets Dingman and Yost cordially. (ECF No. 20, PageID.59 Ex. 1 at 0:54-57). Dingman introduces himself and Yost as representatives of the Fire Marshal's office and explains why they are at his house and briefly discusses the closure of the garage. (*Id.* at 1:05). At the same time, Komor is seen holding a phone; apparently, he was on the phone with Siegrist, who could hear the conversation between Komor and Dingman. (ECF No. 25, PageID.130).

3

After non-hostile greetings, Dingman, in reference to looking in Komor's garage states, "It doesn't have to be a big deal. We just want to see what you've got. You got anything illegal in there? Any Class B stuff?" (*Id.* at 1:09-13). Komor responded calmly, "No. It's all C stuff. I went to Ohio and grabbed it all." (*Id.* at 1:18). Next, Dingman asks, "Can we take a look?" (*Id.* at 1:20). Komor responded calmly, "Yeah. Hang on. Give me one second. Let me put my dogs inside." (*Id* at 1:20-22). Banter and laughs are exchanged, and Komor steps inside his house to put the dogs away and emerges wearing a t-shirt. (*Id.*)

Yost receives phone calls during the interaction and an undefined amount of time elapses between Komor opening his garage and MBFS and ATF entering the garage. Komor reopens his garage, letting Dingman and Batten inside to look around and take pictures, while Yost stands back recording portions of the interaction. (ECF No. 20, PageID.60 Ex. 2 at 0:00-0:22). Speaking over Dingman, Komor openly admits to knowing the requirements for selling commercial grade explosives and that he served a federal sentence for selling commercial grade explosives without a license before. (*Id.*) Dingman interrupts Komor to tell him, "Don't tell me anymore than you have to" and through indistinct chatter about the seizure of the fireworks Komor laughs and responds, "I appreciate that." (*Id.* at 0:44). As Dingman and Batten search through the boxes, identifying them as 1.3-gram commercial grade explosive fireworks, Komor chuckles and says, "It's fine

4

man. As a matter of fact, I'll help you all." (*Id.* at 1:04-1:30). As Batten documents the garage, in a peaceful demeanor and friendly tone, Dingman and Komor exchange stories and remarks. (*Id.* at 1:33-2:04).

### III. ANALYSIS

#### A. Fourth Amendment Standard

Komor argues that the evidence obtained from the search of his garage should be suppressed because MBFS and ATF did not have a warrant. Komor argues that the demands to search his property were unlawful because the fire marshals did not obtain his consent to search. (ECF No. 13 Page.ID 6). Komor argues that the fire marshals unexpectedly showing up at his home was akin to coercion because he had no time to oppose or challenge these actions nor consider a knowing and voluntary consent to search. (ECF No. 13 Page.ID 6).

At the evidentiary hearing, Komor argued that he was cooperative with the fire marshals but never consented to a search. (ECF No. 25, PageID.143). Komor argues that the contents of his garage were blocked by a large white Pontiac sitting on blocks, implying that fire marshal Dingman could not have seen the fireworks boxes from his car. (*Id.*) Komor argued that he desired privacy in the garage because he closed it before greeting the fire marshals. (ECF No. 25, PageID.127).

Komor introduced evidence through testimony that his stepbrother, Siegrist, overheard his conversation with Dingman. Siegrist testified that he heard someone

5

say, "We are going to *expletive* this place up if you make us get a warrant." (ECF No. 25, PageID.132). Komor introduced further testimony that Siegrist had to come open the garage for him because he locked his keys in the garage. (ECF No. 25, PageID.134).

The Government responds that the Motion should be denied because: (1) Komor consented to a public safety search of his garage and the body camera footage establishes his voluntarily consent (ECF No. 20, PageID.62); (2) Komor knowingly consented to the search because of his age, criminal background, and prior federal conviction for dealing in explosives without a license (*Id.*); and (3) the administrative and public safety nature of the fire marshal's search did not put Komor in fear of punishing conduct because the marshals do not possess arresting power. (*Id.*)

Komor contends that the fire marshals, without warrant or other documents, demanded to inspect and search his garage because they lacked a consent form. He claims the search and seizure were unconstitutional and should be suppressed. The Government argues that Komor voluntarily consented and had enough life experience to invoke his Fourth Amendment right if he felt so inclined. The Court must determine whether the Government has met the burden of proving Komor's consent was voluntarily.

The Fourth Amendment to the Constitution provides "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause . . ." U.S. CONST. amend. IV. It is well-established that "the ultimate touchstone of the Fourth Amendment ... is reasonableness." *Michigan v. Fisher*, 558 U.S. 45, 47 (2009). If a search is conducted without a warrant, i.e., without prior judicial approval, the search is *per se unreasonable*, subject to limited exceptions. *Mincey v. Arizona*, 437 U.S. 385, 390 (1978). "Consent to search is a well-established exception to the Fourth Amendment's warrant requirement." *United States v. Cochrane*, 702 F.3d 334, 342 (6th Cir. 2012). The government bears the burden of proving that the consent was voluntary. *Id.* (citing *United States v. Beauchamp,* 659 F.3d 560, 570 (6th Cir. 2011)). While knowledge of the right to refuse may be considered as a factor, it is not a necessary finding. *Schnecklock v. Bustamonte*, 412 U.S. 218, 227 (1973). "Consent is voluntary when it is unequivocal, specific and intelligently given, uncontaminated by any duress or coercion." *Beauchamp,* 659 F.3d at 571 (internal quotation marks and citations omitted).

In determining if consent was voluntary, the court considers "the totality of the circumstances, including the individual's age, intelligence, education, whether the individual understands his or her right to refuse consent and his or her

constitutional rights, the length and nature of the detention, whether the police used any coercive or punishing conduct, including 'subtle forms of coercion that might flaw an individual's judgment.'" *United States v. Collins*, 683 F.3d 697, 701 (6th Cir. 2012) (quoting *Beauchamp*, 659 F.3d at 571). Whether "consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973).

Komor's garage was searched without a warrant by the fire marshals because of a public safety complaint. However, despite testimony suggesting the opposite, Komor knowingly and voluntarily consented to the search of his garage. The Court finds Komor gave his consent to the fire marshals, freely and voluntarily when he responded affirmatively to their request to look inside his closed garage. Considering the friendliness of the interaction, his background in dealing with commercial grade fireworks and law enforcement, and the footage capturing key moments of the interaction between Komor and the fire marshals, the Government has met its burden.

**B. Consent**

When fire marshal Dingman approached Komor's home on the eve of the Fourth of July celebration, there was no sense of immediacy or rush involved in the interaction. In *Beauchamp*, 659 F.3d at 565-69, the Sixth Circuit found that the

8

defendant did not voluntarily consent to a search while walking on the street at 2:00 a.m. because he was immediately stopped, detained, questioned, and frisked for weapons by the police, and previously, had walked away from two police officers who had followed him several blocks apart. *Id*. Unlike the Defendant in *Beauchamp*, the timeline here demonstrates that Komor was not stopped, detained, frisked, or questioned in an interrogating manner. Komor had the opportunity to refuse consent to the fire marshal's search. *Id*.

Komor, emerged from his pool and had enough time to grab his phone, answer his stepbrother's call, close his garage, throw an item in the trash, and towel off after a swim, before engaging in conversation with the fire marshals. Komor answered a call from his stepbrother who informed him that the "marshals" were outside his home. Unlike the defendant in *Beauchamp*, Komor, in his home, had time to contemplate and think about his engagement with the fire marshals before greeting them and welcoming them into his home. *Id*.

### C. Totality of the circumstances

Komor argues however, that because he closed and locked his garage before greeting the fire marshals, he intended to maintain his privacy. The Sixth Circuit has observed that the fact that a defendant is confronted with police officers in full uniform does not render his consent to be coerced. *United States v. Johnson*, 109 F. App'x 76, 81 (6th Cir. 2004). Komor further argues that the fire marshals did not

present him with a consent form and threatened to "tear his *expletive* up" which coerced him into consenting to the search. Yet, the totality of the circumstances in this instance are not indicative of any intention by Komor to preserve the privacy in his home or that Komor was coerced, pressured, or even intimated by the fire marshals. *United States v. Collins*, 683 F.3d 697, 701 (6th Cir. 2012) (quoting *Beauchamp*, 659 F.3d at 571).

Here, the fire marshals did not carry consent forms because they are not the police and do not have the power to arrest. The fire marshals mainly issue citations for public safety violations. Komor's act of closing his garage in order to maintain privacy is negated by his agreement to the search, reopening his garage, and his behavior towards the fire marshals once they were inside the garage. At the time of the search, Komor was 51 years old, had experienced a raid in search of illegal fireworks by federal marshals, and served a prison sentence related to the same raid. Some relevant factors in determining voluntariness, none of which are present here, include the repeated and prolonged nature of questioning, the use of physical punishment such as the deprivation of food or sleep, and the length of detention. *Schneckloth* 412 U.S. at 226. The iPhone footage, as stipulated by the parties, was a compilation of about an hour and a half interaction between Komor and the fire marsals. It is clear from each segment of the iPhone footage that Komor experienced no prolonged or repeated questioning, was not made any offers or

promises, and received no threats of any kind. In fact, Komor appeared calm in each video segment.

Even if the fire marshals did curse at Komor before entering into his garage, as suggested by testimony, this is negated by video footage depicting Komor chuckling, offering to assist, and receiving a reminder from the fire marshals to stop sharing information about his unlicensed online firework business because if he disclosed more public safety violations, the fire marshals would be forced to act further.

Komor's statement agreeing to the search is on par with other situations the Sixth Circuit has found sufficient to convey voluntary consent. *United States v. McCauley*, 548 F.3d 440, 447 (6th Cir. 2008). The evidence obtained from the search of Komor's home is admissible because he knowingly and voluntarily consented to the search of his home.

## IV.     CONCLUSION

For the reasons set forth above,

**IT IS HEREBY ORDERED** that the Court **DENIES** David Allen Komor's Motion to Suppress (ECF No. 13). The evidence obtained from the search is admissible.

s/Denise Page Hood<br>DENISE PAGE HOOD<br>United States District Judge

DATED: March 30, 2022